[Cite as *State v. Tolliver*, 2020-Ohio-3121.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                              :

    Plaintiff-Appellee,              :

                               No. 108955

v.                                          :

GREGORY TOLLIVER,                           :

    Defendant-Appellant.             :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 28, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-640790-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Timothy Troup, Assistant Prosecuting Attorney, *for appellee.*

Christopher M. Kelley, *for appellant.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Defendant-appellant, Gregory Tolliver, appeals from the trial court's judgment, rendered after a bench trial, finding him guilty of kidnapping, felonious

assault, and domestic violence, and sentencing him to five years in prison. Finding no merit to the appeal, we affirm.

## I.   Facts and Procedural History

{¶ 2}   Tolliver was originally indicted in February 2019, in CR-19-636111 on two counts of felonious assault in violation of R.C. 2903.11(A)(1) and three counts of domestic violence in violation of R.C. 2919.25(A). The charges related to incidents that occurred on September 8, 2018, December 27, 2018, and January 5, 2019, when Tolliver assaulted his girlfriend, Tamara Townsend.

{¶ 3}   After rejecting all plea offers, Tolliver was reindicted on June 19, 2019, in CR-19-640790 on two counts of kidnapping in violation of R.C. 2905.01(A)(3); three counts of felonious assault in violation of R.C. 2903.11(A)(1); three counts of domestic violence in violation of R.C. 2919.25(A); one count of violating a protection order in violation of R.C. 2919.27(A)(1); and one count of intimidation of a crime victim or witness in violation of R.C. 2921.04(B)(1).[1] Counts 9 and 10, violating a protection order and intimidation of a crime victim or witness, were dismissed prior to trial. Tolliver waived his right to a jury, and the trial court commenced a bench trial on June 27, 2019.

---

[1]The counts related to the three incidents as follows:  Count 1, kidnapping for a daytime incident on January 5, 2019; Count 2, kidnapping for an evening incident on January 5, 2019; Counts 3 and 4, felonious assault and domestic violence for the daytime incident on January 5, 2019; Counts 5 and 6, felonious assault and domestic violence for the December 27, 2018 incident; and Counts 7 and 8, felonious assault and domestic violence for the September 9, 2018 incident.

**{¶ 4}** Townsend testified that at the time of the offenses, she had been in a relationship with Tolliver for seven years. She said that she and Tolliver were not living together at the time of the offenses, but had lived together for nearly a year in 2014. Townsend said that she was living with her grandmother in a duplex house when the offenses occurred.

**{¶ 5}** Townsend testified to four separate incidents of abuse by Tolliver. She said the first incident occurred on September 9, 2018, when Tolliver punched her in the eye, causing a hairline fracture of her eye socket bone, and leaving her with a black eye that was still visible at the time of trial. Townsend said that she did not call the police after this incident, but a friend took her to the hospital for treatment. She said that she could not remember what caused the incident, she and Tolliver did not talk about the incident, and their relationship resumed after the incident.

**{¶ 6}** Townsend testified that she went to the hospital again on December 27, 2018 as a result of a second incident. She said that this time, Tolliver punched her twice in the nose with a closed fist because he was angry at her for "not listening; for not hearing what [he] said the first time." Townsend said she again did not call the police, but took the bus to the hospital, where she was treated for a fractured nose and pain. Townsend said that she stayed with her aunt for a week after this incident because Tolliver did not know where her aunt lived, and she was afraid to go back to her grandmother's house. Townsend admitted that she continued talking

with Tolliver during this week, however, and that when she went back to live with her grandmother, her relationship with Tolliver "went back to normal."

{¶ 7} The third and fourth incidents occurred on January 5, 2019. Townsend said that the attic of her grandmother's house was furnished with a couch and used as a TV room, and that she sometimes let Tolliver stay there. She said she knew Tolliver was upset with her that day because she had not answered a phone call from him the night before, but she nonetheless went upstairs when he called her and told her to come to the attic.

{¶ 8} Townsend said that when she arrived in the attic, Tolliver yelled at her and then hit her "all over" her body with a closed fist. She said that as he beat her, he told her she was "dumb, stupid"; that she "should have listened," and "should have answered her phone." She said that he grabbed an electrical cord and hit her 15 to 20 times with it and then threw a hot plate at her, burning her from her knee to her ankle.

{¶ 9} Townsend said that the beating continued for nearly an hour, and she was in fear for her life while it was happening. She said that she screamed and repeatedly yelled "stop," but members of her family, who were on the first floor of the house, did not come to help her. She said that Tolliver would not let her leave the attic and physically restrained her multiple times when she tried to leave.

{¶ 10} Townsend testified that Tolliver finally allowed her to leave because her family kept repeatedly calling her phone to find out where she was. She said she

went to a downstairs bathroom to clean her face before her family saw it, and then went to her bedroom, where she slept for a few hours.

{¶ 11} Townsend said that she texted Tolliver upon waking up, and he told her to bring him a cigarette in the back hallway. She said that when she arrived in the hallway, "he smacked the cigarette out my hand, started yelling, and made me go in the basement." Townsend said that she did not want to go to the basement with Tolliver but complied with his order because she "always [did] whatever he told her to do."

{¶ 12} Townsend said that in the basement, Tolliver hit her "hard" three or four times in her face with his fist, refracturing her nose and requiring stitches above and below her eye and to her top and bottom lips. She said the incident lasted five to ten minutes, and that she was unable to escape up the single flight of stairs. Townsend said that Tolliver eventually told her to go back up to the attic, but "scared that it would get worse," she ran up the basement stairs, through the door to her grandmother's house, and into her bedroom, where she called 911.

{¶ 13} The police arrived five to ten minutes later. An ambulance took Townsend to the hospital, where she stayed overnight. Townsend identified photographs of injuries to her face, thighs, back, and leg that were taken by the police at the scene. She also identified state's exhibit No. 7 as medical records of her treatment relating to the December 2018 and January 2019 incidents. Townsend said that after the January 5 incidents, she moved from her grandmother's house,

changed her phone number, and began seeing a counselor. She said she had not seen Tolliver again until the day of trial.

{¶ 14} Cleveland Police Detective Walter Emerick testified that he responded to Townsend's grandmother's house on January 7, 2019, to investigate the incident. He spoke with Townsend and took pictures inside and outside the house. Detective Emerick identified state's exhibits Nos. 10 through 43 as the photographs he had taken, including a photograph of the electrical cord that Townsend said Tolliver used to beat her, a photograph of the hot plate, and photographs of Townsend's injuries to her face, which were still visible two days after the attacks. Detective Emerick testified that exhibits Nos. 21 and 22 were photographs of blood smeared on the washing machine in the basement of the house, and exhibit No. 39 was a photograph of blood spots on the floor in the attic.

{¶ 15} Cleveland Police Officer Elaina Ciacchi testified that she responded to the scene on January 5, 2019, after a report of a female assaulted. She said that although she sees "a lot" of domestic violence cases, she remembered this incident well because "the assault that occurred on the victim, it was pretty bad. I mean, I hadn't seen anything like that."

{¶ 16} Office Ciacchi testified that she spoke with Townsend and her family members, who were upset. She said that Townsend gave a description of her assailant and told her that he might still be in the house. The police searched the house but did not locate Tolliver. Officer Ciacchi testified that she observed blood

on the washing machine in the basement that was consistent with what Townsend told her had happened.

{¶ 17} Cleveland Police Detective Adonna Perez testified that she responded to University Hospitals in the early morning hours of January 6, 2019, to interview Townsend, who identified Tolliver as her assailant and told her about the current assaults, as well as the previous assaults in September and December, 2018. Detective Perez testified that she observed injuries on Townsend that were consistent with an assault: her face was severely swollen, and there were visible lumps on her head and face, cuts on her face and eyes, blood on her lips, nose, and face, bruising down the left side of her body, and a burn on her shin.

{¶ 18} After the trial court denied Tolliver's Crim.R. 29 motion for acquittal, Tolliver testified in his own defense. With regard to the September 9, 2018 incident, he said that "nothing happened," and he had "no clue" why Townsend would accuse him of beating her so hard that she had to go to the hospital.

{¶ 19} Tolliver said he began staying in the attic of Townsend's grandmother's house around December 10, 2018, because he had nowhere else to stay. With regard to the December 27, 2018 incident, Tolliver said he "never punched" Townsend, had "no idea" why she had a fractured nose, and that Townsend never told him why she went to the hospital.

{¶ 20} Tolliver testified that prior to the January 5, 2019 incidents, he and Townsend had been having "trust issues" because a woman had called Townsend and told her she was pregnant with Tolliver's baby. Tolliver testified that when he

woke up at approximately 11:30 a.m. on January 5, he called Townsend and asked her to bring him a cigarette. He said that Townsend started "going off" on the phone about issues in their relationship, so he asked her to come to the attic. He said that when she came up to the attic, he told her he was going to leave her because he thought she was cheating on him. He said that Townsend became enraged, grabbed him, hit him in the back of his head, and then grabbed a pen and came at him. Tolliver said that he felt threatened, so he pushed her. He said Townsend started swinging at him with the pen, so he held her arm and then grabbed the electrical cord and hit her three or four times with it. Tolliver said that Townsend left after he taunted her about the other woman, and he went to sleep.

{¶ 21} Tolliver said that when he woke up around 9 p.m., he called Townsend and asked her to bring a cigarette to him in the back hallway of the house. He said that when they met in the hallway, he asked Townsend if they could talk in the basement. He said that in the basement, he asked Townsend why she was making him feel that he could not trust her, and she became angry, pushed him up against the dryer, and started swinging at him. Tolliver said he swung at Townsend, hitting her eye, and then slapped her three times, hitting her mouth. He said that as he was walking up the stairs, Townsend ran past him, pushed him off the stairs, and ran inside her grandmother's house. Townsend then texted Tolliver and told him the police were on their way, so he left.

{¶ 22} On cross-examination, Tolliver agreed that the blood on the washing machine as shown in state's exhibit No. 22 was Townsend's blood, either from when

he hit her during the attic incident and "busted" her lip, or from when he hit her in the face three times in the basement. He further agreed that the blood on the attic floor was Townsend's blood. Tolliver also agreed that despite his testimony that Townsend hit him several times, his booking photos did not show any swelling or marks on his face.

{¶ 23} After again denying Tolliver's Crim.R. 29 motion, the trial court found him guilty of Count 1, kidnapping relating to the first January 5, 2019 incident; Count 2, kidnapping relating to the second January 5, 2019 incident; Counts 3 and 4, felonious assault and domestic violence, respectively, relating to the first January 5 incident; and Counts 5 and 6, felonious assault and domestic violence, respectively, relating to the December 27 incident. The trial court found Tolliver not guilty of Counts 7 and 8, felonious assault and domestic violence, respectively, relating to the September 9 incident.

{¶ 24} At the initial sentencing hearing, defense counsel advised the court that Tolliver wanted a new attorney. Upon questioning by the court, Tolliver said he had filed a pro se motion for new counsel because he believed that his counsel had not adequately prepared a defense for the kidnapping counts after he was reindicted. Tolliver said that he was reindicted after he rejected two plea offers, and that he "just felt like it was a violation [his] constitutional rights" because he was reindicted on felony charges that were not initially indicted, and that his counsel was not given adequate time to prepare a defense. After another hearing on the issue, the trial court granted Tolliver's motion and appointed new defense counsel.

{¶ 25} At the sentencing hearing, the trial court merged the felonious assault and domestic violence charges, and sentenced Tolliver to five years incarceration on Count 1, kidnapping; four years on Count 2, kidnapping; four years on Count 3, felonious assault; and four years on Count 5, felonious assault. The court ordered the sentences to be served concurrently, for a total prison term of five years. This appeal followed.

## II. Law and Analysis

### A. Superseding Indictment

{¶ 26} In his first assignment of error, Tolliver contends that the reindictment violated his due process rights because he was reindicted on additional charges due to prosecutorial vindictiveness after he rejected two plea offers and insisted on going to trial. We find no due process violation.

{¶ 27} Initially, we note that immediately prior to trial, defense counsel informed the court that Tolliver had no objection to dismissing the first indictment and proceeding to trial on the reindictment. (Tr. 10-11.) Accordingly, Tolliver waived any objection to the reindictment. Tolliver's argument also fails on the merits.

{¶ 28} When the state increases the severity of the charges against a defendant after a trial has begun, there is a presumption that the state acted with animus toward the defendant. *State v. Wilson*, 47 Ohio App.3d 136, 547 N.E.2d 1185, syllabus (8th Dist.1988). No such presumption applies when the state acts in a similar way during the pretrial phase of a criminal case. *Id.* Instead, the burden

is on the defendant to show that the state's decision was motivated by vindictiveness. *Id.*

{¶ 29} "[A] threat of indictment on more serious charges is not a violation of due process." *State v. Staten*, 7th Dist. Mahoning No. 03 MA 187, 2005-Ohio-1350, ¶ 47. A prosecutor is permitted to use the possibility of reindictment on more serious charges as an inducement in the plea bargain process. As stated by the U.S. Supreme Court in *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978):

> While confronting a defendant with the risk of more severe punishment clearly may have a "discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable" — and permissible — "attribute of any legitimate system which tolerates and encourages the negotiation of pleas." By tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his right to plead not guilty.

*Id.* at 364, quoting *Chaffin v. Stynchcombe*, 412 U.S. 17, 31, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973).

{¶ 30} Tolliver does not dispute the prosecutor's right to use the threat of additional charges to induce a plea, nor the prosecutor's right to then reindict if the defendant does not accept the plea offer. Rather, he contends that the reindictment in this case was motivated by prosecutorial vindictiveness because he was reindicted on the more serious kidnapping charges on June 19, 2019, and his case went to trial only eight days later. He contends that the reindictment was vindictive because "the

state waited until days before trial to obtain a superseding indictment and then proceeded directly to trial."

{¶ 31} We find no vindictiveness under these circumstances. First, Tolliver could have requested a continuance to prepare for trial on the additional charges, but did not do so. Moreover, Tolliver was well informed during plea negotiations that he could be reindicted on the kidnapping charges, and the evidence supporting the kidnapping charges was contained in documents provided to Tolliver during discovery after the first indictment.

{¶ 32} At the initial sentencing hearing, after Tolliver said he wanted a new lawyer, the trial court questioned defense counsel about Tolliver's claim that he did not have adequate time to prepare for trial on the additional charges because he was reindicted so close to the trial date. Defense counsel informed the court that Tolliver had been made aware of the possibility of a reindictment during the plea discussions. (Tr. 179.) Defense counsel further advised the court that the reindictment did not raise any new evidentiary issues or require any new witnesses. (Tr. 180.) In fact, he told the court that "the victim in this case, she didn't make any new statements that would add a charge of kidnapping. That evidence was always there. It just wasn't charged." (Tr. 181.)

{¶ 33} The trial court took Tolliver's request for a new lawyer under advisement. At the next hearing, the trial court again questioned the prosecutor and defense counsel about whether any new discovery was required to address the kidnapping counts in the reindictment. (Tr. 187.) The prosecutor told the court that

"the new indictment contained charges related to the original facts, to the original discovery, the original reports and medical records that we had. They were part of all the pretrial conversation that I had with defense counsel." (Tr. 188.) Defense counsel agreed with the prosecutor's representations to the court, describing them as accurate with regards to the kidnapping charges. The factual basis for those charges was contained in the original police report, that is to say, the statements of the alleged victim in this case could have possibly supported, you know, this charging of kidnapping." (Tr. 188-189.) Furthermore, defense counsel told the court that Tolliver was advised during plea negotiations of the scheduled trial date, and that he would be reindicted on more serious charges if the matter proceeded to trial. (Tr. 190-191.)

{¶ 34} Under these circumstances, Tolliver has not met his burden of demonstrating either prosecutorial vindictiveness or a denial of due process. The record reflects that the evidence supporting the kidnapping charges was contained in the discovery related to the first indictment and that no additional discovery was required after the reindictment. Furthermore, Tolliver was advised during plea negotiations that he would be reindicted on the kidnapping charges if he took the matter to trial, and he was also advised of the looming trial date. On this record, there is nothing whatsoever to indicate the reindictment was the vindictive result of Tolliver's exercise of his right to trial; accordingly, the first assignment of error is overruled.

## B. Sufficiency of the Evidence

{¶ 35} Tolliver was convicted of kidnapping in violation of R.C. 2905.01(A)(3), which provides that "no person, by force, threat, or deception * * * by any means, shall * * * restrain the liberty of the other person to terrorize, or to inflict serious physical harm on the victim." He was also convicted of felonious assault in violation of R.C. 2903.11(A)(1), which provides that "no person shall knowingly cause physical harm to another." And he was convicted of domestic violence in violation of R.C. 2919.25(A), which provides that "no person shall knowingly cause or attempt to cause physical harm to a family or household member." "Family household member" includes a "person living as a spouse of the offender;" a "person living as a spouse" includes "a person who is cohabiting with the offender, or who otherwise has cohabitated with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(1)(a)(i) and (F)(2).

{¶ 36} In his third assignment of error, Tolliver contends that the trial court erred in denying his Crim.R. 29 motions for acquittal because the evidence was insufficient to support his convictions.

{¶ 37} A Crim.R. 29 motion challenges the sufficiency of the evidence. The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 13. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at

trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompson*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 38} Tolliver contends that the evidence was insufficient to support his convictions because the state's case was based primarily on Townsend's testimony, which he asserts was "unreliable and untrustworthy." Specifically with regard to the kidnapping convictions, he contends there was no evidence that he restrained Townsend's liberty.

{¶ 39} Although Tolliver asserts that Townsend was not a credible witness, the test for sufficiency is not whether the state's evidence is to be believed, but whether, *if believed*, the evidence would support a conviction. *Hill* at ¶ 16, citing *State v. Woods*, 8th Dist. Cuyahoga No. 82789, 2004-Ohio-2700, ¶ 63. This court does not weigh the credibility of the witnesses when reviewing the sufficiency of the evidence. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79.

{¶ 40} Townsend testified that she went to the hospital on December 27, 2018, because Tolliver punched her twice in the nose with a closed fist, fracturing her nose and requiring medical treatment. She testified further that on January 5, 2019, Tolliver would not allow her to leave the attic and physically restrained her

when she tried to leave, and that he beat her all over her body with his fist, hit her numerous times with an electrical cord, and threw a hot plate at her, burning her leg from her knee to her ankle. Townsend testified that Tolliver ordered her to go to the basement later that day, and once in the basement, hit her three or four times in her face, refracturing her nose. She testified further that she was unable to escape from the basement during this incident. Finally, she testified that at the time of the offenses, Tolliver was her boyfriend of over seven years and, although they were not presently living together, they had lived together in 2014 for nearly a year.

{¶ 41} Townsend's testimony, if believed, is sufficient to support all the elements of Tolliver's convictions for kidnapping, felonious assault, and domestic violence. Accordingly, the third assignment of error is overruled.

## C. Manifest Weight of the Evidence

{¶ 42} In his second assignment of error, Tolliver contends that his convictions were against the manifest weight of the evidence.

{¶ 43} In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. A reviewing court "weighs the evidence and all reasonable inference, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 388, 678 N.E.2d 541. A conviction should be reversed as against the manifest weight of the evidence

only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 44} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The trier of fact may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *Hill* at ¶ 33, citing *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 45} Townsend was the only witness to the assaults. As set forth above, she testified that she went to the hospital on December 27, 2018, because Tolliver had punched her twice in the nose with a closed fist, necessitating medical treatment. She testified further that on January 5, 2019, while she and Tolliver were in the attic of her grandmother's house, Tolliver beat her all over her body with his fist, hit her numerous times with an electrical cord, and threw a hot plate at her, burning her leg. She testified that the incident lasted for nearly an hour, she was in

fear for her life while it was happening, and that Tolliver physically restrained her when she tried to leave.

{¶ 46} She testified further that later the same day, Tolliver used a ruse to get her to the back hallway of the house by asking her to meet him there and give him a cigarette. When she did so, Tolliver ordered her to go the basement, from which she could not escape, and then hit her again three or four times in her face. Townsend said she was able to escape from the basement only after Tolliver told her to go to the attic, but instead, she ran up the stairs and into her grandmother's house.

{¶ 47} Tolliver contends that his convictions are against the manifest weight of the evidence because Townsend was not a credible witness, and there was no corroborating evidence of the assaults. He argues that Townsend had a "clear personal interest to advance her testimony" because she was upset that another woman was pregnant with his baby, and that her testimony about the assault in the attic was not credible because none of her family members heard her screaming during the hour-long assault.

{¶ 48} Tolliver's arguments are without merit. It is plausible that people on the first floor of a house may not hear screaming in the attic. And the testimony that Townsend was allegedly upset because another woman was pregnant with Tolliver's baby came only from Tolliver, who obviously had an interest to paint Townsend as the aggressor in the assaults. But most importantly, Tolliver admitted that he "busted" Townsend's lip in the attic when he hit her, just as Townsend testified, and

that he hit her in the face three times when they were in the basement, again just as Townsend testified.

{¶ 49} With respect to his kidnapping conviction on Count 1, Tolliver contends his there was no credible evidence that he restrained Townsend in the attic because she willingly went up to the attic, and the altercation occurred only after he accused her of infidelity. Regarding Count 2, the kidnapping related to the basement incident, Tolliver again contends there was no evidence he restrained Townsend because she went willingly to the basement and the altercation lasted "only five minutes." These arguments also fail.

{¶ 50} Townsend's testimony was clear that although she willingly went to the attic to give Tolliver a cigarette, once she was there he started beating her and physically restrained her when she tried to leave. And the five to ten minute length of the incident in the basement is not dispositive of whether Tolliver restrained Townsend during the incident. Townsend testified that Tolliver ordered her to go to the basement even though she did not want to go, and that she was unable to escape from the basement during the beating.

{¶ 51} The trial court, as the finder of fact in this case, was in the best position to evaluate Townsend's testimony and weigh any inconsistencies in her testimony. On this record, we do not find her testimony so incredible that the trial court lost its way or created a manifest miscarriage of justice in believing her.

{¶ 52} Furthermore, a conviction is not against the manifest weight of the evidence merely because the victim was the sole eyewitness to the event. *State v.*

*Martin*, 8th Dist. Cuyahoga No. 90722, 2008-Ohio-5263, ¶ 42; *see also State v. Mansour*, 11th Dist. Trumbull No. 2011-T-0013, 2011-Ohio-5438, ¶ 23 and cases cited therein (all holding that the victim's testimony alone was sufficient to support the defendants' convictions for domestic violence). In this case, Townsend's testimony as to what happened — coupled with the testimony of Cleveland Police Officer Ciacchi and Detectives Emerick and Perez; the pictures of the attic, basement, and Townsend's injuries; and Townsend's medical records, in which she identified Tolliver as her assailant — was adequate direct and circumstantial evidence for the trial court to find Tolliver guilty beyond a reasonable doubt.

{¶ 53} This is not the exceptional case in which the defendant's convictions created such a manifest miscarriage of justice that they should be reversed and a new trial ordered. The second assignment of error is therefore overruled.

### D. Allied Offenses

{¶ 54} In his fourth assignment of error, Tolliver contends that the trial court erred in not merging Counts 1 and 2, the kidnapping convictions related to the January 5, 2019 incidents, with Counts 3 and 4, the felonious assault and domestic violence convictions, respectively, related to the January 5 incident in the attic. Tolliver asserts that his convictions for felonious assault, domestic violence, and kidnapping were subject to merger because the offenses were committed with the same animus, were not committed separately, and were not dissimilar in import.

{¶ 55} R.C. 2941.25, Ohio's allied offenses statute, codifies Ohio's double jeopardy protection prohibiting multiple punishments for the same offense. *State*

*v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 12. R.C. 2941.25(A) allows only a single conviction for offenses that are "allied offenses of similar import." Under R.C. 2941.25(B), however, a defendant charged with multiple offenses may be convicted of all the offenses if (1) the offenses are dissimilar in import of significance; i.e., each offense caused separate identifiable harm; (2) the offenses were committed separately; or (3) the offenses were committed with separate animus or motivation. *Ruff* at ¶ 13.

{¶ 56} An appellate court applies a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28. "The defendant bears the burden of establishing his entitlement to the protection provided by R.C. 2941.25 against multiple punishments for a single criminal act." *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18.

{¶ 57} In *State v. Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345 (1979), the Ohio Supreme Court set forth the following criteria for determining what constitutes separate animus within the meaning of R.C. 2941.25(B) when a defendant has been charged with multiple offenses including kidnapping:

> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

{¶ 58} Despite Tolliver's argument otherwise, the evidence in this case does not demonstrate that the kidnapping offense related to the incident in the attic (Count 1) was merely incidental to the felonious assault and domestic violence offenses that occurred there. Tolliver secreted Townsend in the attic, away from her family, for a prolonged period of time so that he could assault her, and he physically restrained her multiple times when she tried to leave. Tolliver's conduct in secreting Townsend for a prolonged time and in preventing her from leaving so he could assault her demonstrated a separate animus for the kidnapping. Therefore, the trial court did not err in not merging Count 1, kidnapping, with Counts 3 and 4, felonious assault and domestic violence, respectively, relating to the January 5 incident in the attic.

{¶ 59} Tolliver's argument regarding the merger of Count 2 with any other counts fails because, as the prosecutor informed the trial court, "Count 2 stands alone. That is the nighttime kidnapping of the victim in the basement of the house where the defendant was able to coerce her to go down in the basement by asking her for a cigarette. There's no felonious assault associated with that, even though he did assault her during that event." (Tr. 207.) Accordingly, there were no felonious assault or domestic violence counts to merge with Count 2, and the trial court properly sentenced Tolliver on that count.

**{¶ 60}** Tolliver having failed to meet his burden of demonstrating his entitlement to the protections of R.C. 2941.25(A), the fourth assignment of error is overruled.

**{¶ 61}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, JUDGE

EILEEN T. GALLAGHER, A.J., and
LARRY A. JONES, SR., J., CONCUR