[Cite as *State v. Gonzales*, 2022-Ohio-2433.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-21-1190

　　　　　Appellee                           Trial Court No.  CRB-19-11538-0101

v.

Adolfo Gonzalez                          **DECISION AND JUDGMENT**

　　　　　Appellant                          Decided:  July 15, 2022

* * * * *

David Toska, City of Toledo Chief Prosecuting Attorney, and
Elizabeth Lawrence, Assistant Prosecuting Attorney, for appellee.

Emil G. Gravelle, III., for appellant.

* * * * *

**ZMUDA, P.J.**

## I.    Introduction

{¶ 1} Appellant, Adolfo Gonzales, appeals the judgment of the Toledo

Municipal Court, sentencing him to 180 days suspended and one year of probation

after it found him guilty of one count of disrupting school activity.

## A. Facts and Procedural Background

{¶ 2} On October 3, 2019, appellant was charged with disrupting school activity in violation of Toledo Municipal Code 537.16(A), a misdemeanor of the first degree. On October 24, 2019, appellant entered a plea of not guilty and his case proceeded to a jury trial on August 11, 2021. The state called two witnesses during its case-in-chief.

{¶ 3} The first witness called by the state was Robert Bailey. Bailey was the school counselor at Riverside Elementary School and was the first person to talk to appellant when he arrived at the school with his daughters on October 3, 2019. Bailey was standing by the front entrance when appellant entered the school and escorted his daughters to the cafeteria. After appellant walked to the cafeteria, assistant principal Suzanne Muggy called Bailey to the cafeteria to ask appellant to exit the school because he was violating a new school policy. According to Bailey, he confronted appellant and appellant became upset and angry. Based upon the surveillance video admitted into the record, appellant stood up at this point, kissed his daughters, and exited the cafeteria. Bailey testified that when appellant was exiting the cafeteria, he started to use profanity and asked "when did this occur?" in reference to the new school policy.

{¶ 4} Bailey indicated that after appellant left the cafeteria, he remained in the front entrance area and began talking with another member of the faculty. Appellant continued standing in the front entranceway after he was made aware of

2.

the new school policy and asked to leave. While standing in the front entrance area, Bailey noticed that appellant was still upset and started pacing back and forth. Bailey heard appellant continue to use profanity saying things like "this is B.S." and "F*** this." Bailey testified that appellant did not make any threats, direct his profanity toward anyone, raise his arms, point at people, or get in anyone's face. Bailey then saw appellant exit the front entrance before returning minutes later and proceeding down to his daughter's classroom.

{¶ 5} Next, the state called Muggy. Muggy was in the cafeteria when appellant first entered the school. According to Muggy, appellant was in the cafeteria with his daughters when she asked Bailey to explain the new policy to him. Muggy indicated that appellant got angry, loud, and disruptive while swearing after Bailey informed him of the new policy. Muggy also testified that appellant was reluctant to get up at first after being told about the new policy, but he eventually got up and was very angry. Muggy then returned to the front entrance area where she saw appellant outside yelling at the secretary. Appellant then reentered the school and Muggy witnessed him using a lot of "F bombs" and "MF'ers" while referring to the staff in a derogatory manner.

{¶ 6} Surveillance videos of the front entrance and the cafeteria were admitted into evidence at trial. The surveillance videos do not include audio. Nonetheless, the videos confirm that appellant walked into the front entrance with his daughters and proceeded to the cafeteria. Appellant then sat down with his

3.

daughters, right before Bailey came over and told appellant about the new policy. Appellant and Bailey had a short conversation before appellant calmly got up and kissed his daughters. While the conversation between appellant and Bailey was taking place, the video shows Muggy had her back to the two men. Thereafter, appellant and Bailey walked back to the front entrance area. Appellant then stood in the front entrance area and had a conversation with a faculty member but did not appear to be upset or angry. He proceeded to talk on the phone and pace around in a normal manner. Appellant then sat down for a short time before exiting the front entrance. The video also showed a number of other adults escorting kids into the school and going in the direction of the cafeteria. Notably, the video did not show appellant reenter the school and at no point was Muggy on the video in the front entrance area.

{¶ 7} At the conclusion of the state's case-in-chief, appellant made a Crim. R. 29 motion which was denied. Appellant did not testify nor call any witnesses. Accordingly, the trial court proceeded with instructions to the jury and the jury retired for deliberations. Ultimately, the jury returned with a guilty verdict on the sole charge of disrupting school activity. The trial court then ordered the preparation of a presentence investigation report and continued the matter for sentencing. At sentencing, the trial court imposed a sentence of 180 days suspended and one year of probation. Thereafter, appellant filed his timely notice of appeal.

4.

## B.    Assignments of Error

{¶ 8} On appeal, appellant assigns the following errors for our review:

I. Appellant's Conviction was Based on Insufficient Evidence.

II. Appellant's Conviction was Against the Manifest Weight of Evidence.

## II.    Analysis

### A.    The state's evidence was insufficient to prove a violation of Toledo's Safe School Ordinance.

{¶ 9} In appellant's first assignment of error, he argues that the evidence presented at trial by the state was insufficient to support his conviction for disrupting school activity.

{¶ 10} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 11} Appellant was convicted of disrupting school activity in violation of Toledo Municipal Code 537.16(A), which states:

No person shall assault, strike, threaten or menace a teacher, instructor, professor, person in charge of a class of students or any employee of any school, college or university, while in the performance of his duties, or

5.

disrupt, disturb or interfere with the teaching of any class of students, or disrupt, disturb or interfere with any activity conducted in a school, college, or university building, or upon the campus or grounds thereof, or in any public place, or improperly and unlawfully assault, strike, threaten, menace, follow, pursue or lay hands upon a student or other person in a school, college or university building, or upon the grounds or campus thereof, or upon the way to or from any school, college or university, or on the way to and from any school, college or university sponsored activity.

{¶ 12} This court has stated that Toledo Municipal Code 537.16(A) "must be judicially construed to apply only to willful acts done with intent to disturb, disrupt, or interfere with school activity and that actually cause a substantial disruption, disturbance, or interference with school activity." *Toledo v. Thompson-Bean*, 173 Ohio App.3d 566, 2007-Ohio-4898, 879 N.E.2d 799, ¶ 24 (6th Dist.).

{¶ 13} In his brief, appellant argues that the state's evidence was insufficient because the surveillance videos submitted at trial do not show that any disturbance occurred. We agree that the surveillance videos do not show any disturbance, but the testimony of the two witnesses, standing alone, is sufficient to support appellant's conviction.

{¶ 14} The state introduced testimony at trial to establish that appellant willfully disturbed, disrupted, or interfered with school activity. In particular, Bailey testified that appellant became upset and angry when Bailey asked him to

exit the school. Bailey also testified that when appellant was exiting the cafeteria, he started to use profanity. Bailey also indicated that after appellant exited the cafeteria he remained in the front entranceway and continued to use profanity, saying things like "this is B.S." and "F*** this."

{¶ 15} Further, Muggy testified that appellant got angry, loud, and disruptive while using profanity after Bailey asked him to exit the school. Muggy also testified that appellant was reluctant to get up from the table after being asked to leave. When he eventually got up from the table, appellant was reportedly very angry. Muggy indicated that she returned to the front entrance area where she saw appellant outside yelling at the school secretary. According to Muggy, appellant then reentered the school using a lot of "F bombs" and "MF'ers" while referring to the staff in a derogatory manner.

{¶ 16} Viewing the foregoing testimony in a light most favorable to the prosecution, we find that the state introduced sufficient evidence to prove beyond a reasonable doubt that appellant willfully disrupted, disturbed, or interfered with a school activity in violation of Toledo Municipal Code 537.16(A). Therefore, appellant's first assignment of error is not well-taken.

### B. Manifest Weight of the Evidence

{¶ 17} In his second assignment of error, appellant argues that his conviction for disrupting school activity is against the manifest weight of the evidence presented at trial.

7.

{¶ 18} When reviewing a manifest weight claim, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). That is, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. *Id.* Our role is to determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* We reverse a conviction on manifest weight grounds for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387.

{¶ 19} Our examination of the precise parameters of the charge of disrupting school activity is not a matter of first impression in this district. Indeed, in *Toledo v. Combs*, 6th Dist. Lucas No. L-07-1364, 2009-Ohio-3207, we previously addressed, and upheld, a conviction for the charge of disrupting school activity. In *Combs*, the defendant argued with the campus protection officer, refused to leave the school, and physically pushed the campus protection officer and school principal, all at the entrance to the gymnasium where a talent show was taking place. *Id.* at ¶ 6. The defendant's daughters, who were part of the talent show, testified that they saw their mother "tussling" with the school principal at the entrance to the gymnasium. *Id.* at ¶ 8. On appeal, we found that the defendant's actions in "insisting on pushing her way into the gym" by shoving the

8.

campus protection officer and principal constituted a disruption of school activity. *Id.* at ¶ 21.

{¶ 20} Notably, while the defendant in *Combs* used profanity while arguing with the campus protection officer, we affirmed the conviction for disrupting a school activity not based on such profanity but rather because the evidence demonstrated that the defendant refused to leave and engaged in a physical altercation brought about by the defendant forcing her way into the gymnasium. Such is not the case here. Appellant did not disrupt any school activity by making physical contact with school officials, and the video evidence introduced at trial in this case demonstrates that the activity of the school was not disturbed in any manner by appellant's behavior.

{¶ 21} *Thompson-Bean* is another case in which we upheld a conviction for disrupting a school activity. In that case, the defendant had a meeting with school faculty and was described as threatening and out of control. *Thompson-Bean, supra,* 173 Ohio App.3d 566, 2007-Ohio-4898, 879 N.E.2d 799, at ¶ 1-3 (6th Dist.). The defendant slammed a door and walked down the hallway yelling and screaming profanity, which caused teachers to come to their doors to investigate. *Id.* at ¶ 4. Based upon the fact that the defendant's actions forced the teachers to stop teaching and come to their doors, we found that there was sufficient evidence to establish a disruption of school activity. *Id.* at ¶ 31. Again, the conviction was upheld because the defendant's actions caused a disruption in normal school

9.

activity and not because of the mere use of profanity. Once again, the facts in *Thompson-Bean* are distinguishable from this case. Here, appellant's actions did not interfere with the operations of the school.

{¶ 22} Other districts have also had occasion to review similar safe school ordinances. The Eighth District passed upon what evidence is required in order to sustain a conviction for a safe school violation in *Euclid v. Moore*, 8th Dist. Cuyahoga No. 75143, 1999 WL 1129580 (Dec. 9, 1999). There, the defendant walked her son to his classroom, hung his coat up in the closet, and got his things out of his school bag. *Id.* at *1. The defendant also spoke to the teacher but she did not stop teaching. *Id.* The defendant then left the classroom. *Id.* On appeal, the defendant raised the issue that there was insufficient evidence to establish that she willfully disrupted, disturbed, or interfered with school activity. *Id.* at *4. The Eighth District agreed, and found that there was no evidence that the defendant's conduct was willful or that it disrupted the lesson being taught by the teacher. *Id.* at *5.

{¶ 23} At trial in the present case, the state introduced the surveillance videos referenced above, in addition to the testimony provided by Bailey and Muggy, in an attempt to establish that appellant willfully disrupted, disturbed, or interfered with a school activity. Although the videos were attempted to be used by the city as evidence to support the school officers' testimony, in actuality the

10.

videos *contradict* both Bailey and Muggy's version of the events that gave rise to the charge of disrupting school activity.

**{¶ 24}** During her testimony, Muggy stated that she saw appellant screaming at the school secretary upon returning to the front entrance area. However, according to the videos, Muggy never returned to the front entranceway and there was nothing in the videos to support the notion that appellant was screaming at anyone. The surveillance video also confirms that Muggy had her back turned to appellant when he initially stood up from the table and left the cafeteria. This directly contradicts Muggy's testimony that she observed appellant when he stood up and left the cafeteria. When asked about the inconsistencies between the videos and her testimony, Muggy acknowledged that she did not appear in the video depicting the front entrance, contrary to her earlier testimony. Muggy further testified that she did not remember the specific sequence of events and that she may have been down the hall or already in the office during the video of the front entrance.

**{¶ 25}** Contrary to the testimony provided by the state's witnesses, the surveillance videos demonstrate that when appellant was asked to exit the school, he did not become visibly upset or angry, as Bailey stated, nor did he appear to get angry and disrupt a school activity, as Muggy indicated. Indeed, the videos clearly establish that appellant's behavior was not disruptive to the students and staff

11.

around him, because the videos show appellant's behavior did not cause *any* reaction by those situated around him.

**{¶ 26}** The videos definitively show that appellant did not interfere with school activity when he left the cafeteria and returned to the front entranceway. Accordingly, the videos ultimately demonstrate nothing from which one can conclude that appellant's actions were "willful acts done with intent to disturb, disrupt, or interfere with school activity and that actually cause a substantial disruption, disturbance, or interference with school activity." *Thompson-Bean* at ¶ 24. This is evidenced by the fact that none of the kids around appellant reacted in any way to appellant as he stood up and exited the cafeteria, and no disturbance was visible on the video during the time in which appellant was pacing in the front entrance area. What the videos do show is the normal, frenetic hustle and bustle of kids being dropped off and adults interacting with each other and the students as everyone prepares for the beginning of another school day. In other words, a normal day at school. The evidence demonstrates that, even assuming appellant was using profanity, it resulted in no willful disturbance or disruption of school activity, because the videos confirm that the children and adults in the vicinity of appellant were simply not affected by appellant's actions.

**{¶ 27}** In short, the surveillance videos that captured the entire incident at issue in this case are in stark contrast to the testimony provided by the state's witnesses at trial. The holdings in *Combs* and *Thompson-Bean* require disruptive

12.

actions. The objective video evidence in this case, however, demonstrates that the appellant's conduct was not disruptive. Because the video evidence unequivocally shows that appellant's actions did not interfere with school activity, we find that appellant's actions are analogous to those of the defendant in *Moore*. Accordingly, we conclude that this is the exceptional case in which the evidence weighs heavily against a conviction for disrupting school activity. Thus, we find that the verdict is against the manifest weight of the evidence, and appellant's second assignment of error is well-taken.

### III. Conclusion

{¶ 28} In light of the foregoing, the judgement of the Toledo Municipal Court is reversed. This matter is remanded to the trial court for a new trial. Costs of the appeal are assessed to the state pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Gene A. Zmuda, J.

Myron C. Duhart, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.